UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DEQUAN LIN,

    Plaintiff,

  v.

KENNETH SALAZAR,
SECRETARY OF THE INTERIOR,

    Defendant.

Civil Action No. 11-1081 (JDB)

## MEMORANDUM OPINION

Plaintiff Dequan Lin brings this action against the Secretary of the Interior in his capacity as head of the U.S. Park Police (hereinafter "defendant"). Lin, a former employee of the Park Police, claims that defendant violated his rights under Title VII of the Civil Rights Act of 1964 by discriminating against him based on his race, national origin, skin color, and sex. Compl. [Docket Entry 1] ¶¶ 1-13, 26-41. In particular, he claims that defendant subjected him to employment discrimination and a hostile work environment in violation of 42 U.S.C. §§ 2000e-16 and 2000e-5. Id. Defendant has moved to dismiss plaintiff's complaint under Federal Rule of Civil Procedure 12(b)(6). Def.'s Mot. to Dismiss or for Summ. J. [Docket Entry 6] ("Def.'s Mot.") at 1. Defendant argues that Lin's claims should be dismissed because he failed to properly exhaust his administrative remedies and has not stated a claim upon which relief can be granted. In the alternative, defendant has moved for summary judgment under Federal Rule of Civil Procedure 56. Id. Upon consideration of the record, and for the reasons stated below, the Court finds that plaintiff has properly exhausted his available administrative remedies. However,

the Court will grant defendant's motion for summary judgment on both the employment discrimination claim and the hostile work environment claim.

I. Background

Lin was hired as a recruit officer by the Park Police on May 11, 2008, subject to a one-year probationary period due to his lack of federal government or law-enforcement experience. Compl. ¶ 7; Def.'s Stmt. of Mat. Facts [Docket Entry 6] ("Def.'s Stmt.") ¶ 2. He was the only person of Chinese national origin and Asian race and skin tone in his training class. Compl. ¶¶ 3-12. During his initial training at the Federal Law Enforcement Training Center in Atlanta, Lin received recognition for scoring near the top of his class in his training exercises. Pl.'s Opp'n to Def.'s Mot. [Docket Entry 7] ("Pl.'s Opp'n"), Ex. 2. However, Lin was also criticized by Officer Kristina Evans for his subpar performance during one of the training exercises. Id. Along with the performance-specific criticism, Officer Evans told Lin that she could tell he did not like working with women.

Lin has given different accounts of exactly what Officer Evans said. In an undated statement made to an Equal Employment Opportunity Commission investigator, Lin wrote that Officer Evans "brought me to Lt. G. Davis at the end of the scenarios and complained to him that I don't like female officers. She said, 'Why don't you listen? Do you have a problem with females? I think you don't like female officers.'" Pl.'s Opp'n, Ex. 8; see also Pl.'s Opp'n at 3. In a 2010 affidavit, Lin made a similar statement: "Officer [K]ristina Evans brought me before Sergeant Davis (currently Lieutenant Davis) and complained to him that I did not want to listen to her and that I have a problem with females and did not think [sic] that I like female officers." Pl.'s Opp'n, Ex. 9. In a 2012 affidavit signed the same day his opposition to defendant's motion was filed, however, Lin gave a different account of Officer Evans's statement, declaring that she

had told him in front of Lt. Davis that "based on who you are, I already know that you don't like working with females." Pl.'s Opp'n, Ex. 2. Although Officer Evans did not mention Lin's national origin, race, skin color, or sex, Lin believed that this criticism was based on his Chinese national origin, Asian race and skin color, and male sex. Id.

Officer Evans shared her criticisms of Lin with several other Park Police employees, including supervisor Lieutenant Noreen Shirmer and at least three of the officers who were eventually responsible for training Lin: Officer Lynda Freedman, Officer Daniel Berberich, and Officer Brandi Adamchick. Pl.'s Opp'n, Exs. 4, 5, 7; Def.'s Mot., Ex. P. All four claim they either disregarded or did not believe Officer Evans's statements. Id. Lin, however, claims to have heard rumors about his problems working with women at all five of the police districts in which he trained.

After finishing his initial training at the Training Center, Lin underwent mandatory field training in the District of Columbia under the tutelage of Officer Freedman, his assigned Field Training Instructor. Def.'s Stmt. ¶ 3. In her weekly reports and in correspondence with her supervisor, Officer Freedman immediately expressed concerns about Lin's ability to complete training successfully. Id. ¶¶ 4-5. Officer Freedman found that although Lin was intelligent, he was unable to apply his knowledge of police procedures to the practical situations that police encounter daily. Id. ¶ 5. She also found that Lin was either unable or unwilling to back up other officers who needed assistance, leading to potentially unsafe situations for Lin, his fellow officers, and the public. Id. Accordingly, Officer Freedman's first evaluation of Lin was largely negative, reflecting several areas where she felt Lin needed to improve before he could become a productive member of the Park Police. Pl.'s Opp'n, Ex. 11.

Lin claims that Officer Freedman had an immediate negative reaction to him and failed to treat him collegially or respectfully. Pl.'s Opp'n, Ex. 9. He attributes this negative treatment to the rumors spread by Officer Evans about his inability to work with women. Id. Officer Freedman acknowledges that she had heard these rumors, but states that she disregarded them and gave Lin "the benefit of the doubt." Id., Ex. 5. Lin also claims that Officer Freedman engaged in "pranks" to irritate him, citing an instance when she drove 103 miles per hour on a damp highway. Id., Ex. 9. Officer Freedman acknowledges that the speeding incident occurred, but denies that it was meant to irritate Lin. Id., Ex. 5.

Around the same time, several officers informed Lieutenant Schirmer, who helped supervise the field training program, that Lin was sleeping in his van. Def.'s Mot., Ex. J.b. When Lieutenant Schirmer confronted Lin about this, Lin supplied Schirmer with a false address. Def.'s Stmt. ¶¶ 15-16. Lin's living arrangements also came up when Officer Freedman, on orders from her supervisor, confronted Lin about several complaints about his body odor. Def.'s Mot., Ex. GG. Lin explained that he had not taken a shower in two days due to his living situation. Id. Because of this incident, and because of his perceived negative treatment by Officer Freedman, Lin contacted Officer Freedman's supervisor and requested a different instructor. Def.'s Stmt. ¶¶ 6-7. When this request was denied, Lin reported sick for three days. Id. ¶¶ 7-8. Lin's superiors suspected that he had reported sick to avoid working with Officer Freedman. Id. ¶¶ 8-9.

After his stint with Officer Freedman, Lin trained under a succession of other Field Training Instructors, all of whom gave Lin more positive evaluations than Officer Freedman. Id. ¶¶ 11-14; Pl.'s Opp'n, Exs. 15-17. All of his instructors, however, noted that Lin's performance had deficiencies. Def.'s Stmt. ¶¶ 11-14. For instance, Officer Jason Omo observed several situations where Lin failed to properly control suspects as they exited their vehicles and

"fumbled with his handcuffs and released control of the suspects as he was attempting to handcuff them." Def.s Mot., Ex. H. Officer Omo believed that Lin's deficiencies could pose "serious safety issues" if left uncorrected, and recommended that Lin continue in the training program instead of being allowed to work on his own. Id.; Def.'s Stmt. ¶¶ 11-14. Based on this recommendation and the feedback from all of Lin's instructors, Sergeant Shain Melott, who helped supervise the field training program, recommended that Lin not be released from field training. Def.'s Stmt. ¶ 20. Instead, Lin would receive further training; if improvement was not shown, he would be terminated. Id.

Lin initially was reassigned to Officer Freedman for further training, and he claims that he again experienced her alleged negative reaction to him. Pl.'s Opp'n, Ex 8. According to Lin, Officer Freedman "continually told [him] he should look for another job and that he was not suited for the work of being a police officer." Id. For her part, Officer Freedman found several deficiencies in Lin's performance. Def.'s Stmt. ¶ 22. The most critical deficiency was his lack of safety skills. For example, Lin did not properly restrain a female prisoner inside the police station, allowing her to swing her arms from side to side. Def.'s Mot., Ex. M. Lin also failed to listen to the radio for situations where an officer might potentially be in distress. Id. Officer Freedman recommended that Lin be given further remedial training before continuing with the training program. Id.

Lin's next Field Training Instructor, Officer C. Whiteman, also found his performance to be poor, observing that he "[did] not see the desire from Officer Lin to do police work." Id. ¶¶ 23-24. Officer Whitman noted that Lin did not follow Park Police protocol in many situations, refusing to stop motorists for tinted windows "because he did not believe it should be illegal"

and failing to interview one of the motorists involved in a three-car accident. Def.'s Mot., Ex. N. Officer Whiteman recommended that Lin be terminated. Id.

Lin was then referred to remedial training, which gives a recruit officer an additional opportunity to improve performance during the probationary period. Def.'s Mot., Ex. P. According to Lin, he was the only member of his training class assigned to receive this additional training. Compl. ¶ 12. His Field Training Instructor for remedial training, Officer Daniel Berberich, gave Lin better performance evaluations than he had received from Officer Freedman, but still noted several areas where Lin needed to improve. Def.'s Stmt. ¶¶ 27-28. Officer Berberich noted that Lin needed "to greatly improve his suspect/prisoner safety," having "twice allowed an arrestee in a cruiser be physically contacted by an unfrisked suspect." Def.'s Mot, Ex. Q. In the hope that Lin would improve if the training were less formal, Officer Berberich requested that the remedial training period be extended one week so he could accompany Lin in plainclothes as an observer and evaluator. Def.'s Stmt. ¶ 29. During this one-week period, he observed Lin search a vehicle without waiting for a backup officer to arrive, perform an illegal search, and let a driver with a suspended license drive away. Def.'s Mot, Ex. S. In general, Officer Berberich felt that Lin's performance was still deficient in several key areas, including officer safety, the ability to deal with suspects and prisoners, knowledge of procedures concerning arrest, and knowledge of search and seizure law. Id. ¶ 31. On Officer Berberich's recommendation, Sergeant Mellott failed Lin in the remedial phase of his training. Id. ¶ 36.

After failing remedial training, Lin was placed on administrative leave with pay. Id. ¶ 37. Lieutenant Schirmer forwarded her recommendation that Lin's employment with the Park Police be terminated to her supervisors, who concurred with that recommendation. Id. ¶ 38-40. On May

6

1, 2009, Lin was notified of his termination for failing field training and unsuitable conduct. Id. After moving through the EEOC administrative process, Lin filed this suit on June 13, 2011. Shortly thereafter, defendant filed the instant Motion to Dismiss or, in the Alternative, for Summary Judgment.

## II. Standard of Review

A. Dismissal for Failure to State a Claim

A plaintiff need only provide a "short and plain statement of [his] claim showing that [he] is entitled to relief," Fed. R. Civ. P. 8(a)(2), that "give[s] the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Erickson v. Pardus, 551 U.S. 89, 93 (2007) (per curiam) (internal quotation marks omitted).  A complaint may be dismissed for failure to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6).  In considering such a motion, the "complaint is construed liberally in the plaintiff['s] favor, and [the Court] grant[s] plaintiff[] the benefit of all inferences that can be derived from the facts alleged." Kowal v. MCI Commc'ns Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994); see Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1113 (D.C. Cir. 2000).

A complaint survives a motion under Rule 12(b)(6) only if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 663 (2009).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw [a] reasonable inference that the defendant is liable for the misconduct alleged." Id. (internal quotation marks omitted).  "A complaint alleging facts which are merely consistent with a defendant's liability . . . stops short of the line between possibility and plausibility of entitlement to relief." Id. (internal quotation marks omitted).

B. Summary Judgment

When, on a Rule 12(b)(6) motion, "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56" and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); see Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003). Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The moving party may successfully support its motion by citing "particular parts of materials in the record" that "support the assertion" that "a fact cannot be or is genuinely disputed," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c); see Celotex, 477 U.S. at 323.

In determining whether there exists a genuine issue of material fact sufficient to preclude summary judgment, the court must regard the non-movant's statements as true and accept all evidence and make all inferences in the non-movant's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). A non-moving party, however, must establish more than the "mere existence of a scintilla of evidence" in support of its position. Id. at 252. By pointing to the absence of evidence proffered by the non-moving party, a moving party may succeed on summary judgment. Celotex, 477 U.S. at 322. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted). Summary judgment is appropriate if the non-movant fails to offer "evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.

III. <u>Failure to Exhaust Administrative Remedies</u>

Defendant has moved to dismiss plaintiff's claims based upon race and color for failure to exhaust administrative remedies. Def.'s Mot at 15. An employee generally must exhaust all of his available administrative remedies before bringing a Title VII action in federal court. <u>Siegel v. Kreps</u>, 654 F. 2d 773, 777 (D.C. Cir. 1981).  Because of the "gatekeeping" function of the exhaustion requirement, it is appropriate for the Court to consider both the initial administrative complaint and the pleadings in deciding a Rule 12(b)(6) motion, and to dismiss the case if administrative remedies were not properly exhausted. See <u>Ahuja v. Detica, Inc.</u>, 742 F. Supp. 2d 96, 103 (D.D.C. 2010).

Plaintiff's initial complaint to the Department of Interior alleged discrimination based on sex and national origin, while the complaint filed in this Court adds allegations of discrimination based on race and color. Compl. ¶ 1. A Title VII claim is "limited in scope to claims that are like or reasonably related to the allegations in the [administrative complaint]." <u>Park v. Howard Univ.</u>, 71 F. 3d 904, 907 (D.C. Cir. 1995) (internal quotation marks omitted).  However, Title VII does not require "the use of magic words to make out a proper discrimination charge." <u>Maryland v. Sodexho, Inc.</u>, 474 F. Supp. 160, 162 (D.D.C. 2007). The exhaustion doctrine is not meant to be "a massive procedural roadblock to access to the courts"; instead, it is "a pragmatic doctrine" meant to ensure that agencies have "an opportunity to handle matters internally whenever possible" and to only burden federal courts "when reasonably necessary." <u>Brown v. Marsh</u>, 777 F. 2d 8, 14 (D.C. Cir. 1985) (internal quotation marks omitted).  Hence, the predominant consideration behind the exhaustion doctrine is whether "the Title VII claims . . . arise from the administrative investigation that can be reasonably expected to follow the charge of discrimination." <u>Park</u>, 71 F. 3d at 908.

While an allegation of racial discrimination in an administrative complaint does not preserve an allegation of national origin discrimination for a Title VII action, the reverse is not necessarily true. Compare Brown v. Georgetown Univ. Hosp. Medstar Health, 828 F. Supp. 2d 1, 7 (D.D.C. 2011) (claim of national origin discrimination preserves claim of racial discrimination) with Sisay v. Greyhound Lines, Inc., 34 F. Supp. 2d 59, 64 (D.D.C. 1998) (claim of racial discrimination did not preserve claim of national origin discrimination). In Brown, the plaintiff alleged only discrimination based on his African-American national origin in his administrative complaint, but pled discrimination based on race when he filed suit in federal court. Brown, 828 F. Supp. 2d at 7.   The court noted that claims based on race and claims based on national origin might not be "'closely related in some cases,'" id. (quoting Sisay, 34 F. Supp. 2d at 64), but found that plaintiff's complaint of discrimination based on her African-American national origin would "reasonably trigger an administrative investigation into racial discrimination." Id.

The same is true here. When the Park Police and the Department of Interior received Lin's charge of discrimination based on national origin, they were in a similar position to the Brown employer. Just as African-American national origin is closely associated with African-American race, Chinese national origin is so closely associated with Asian race and skin color that a claim of race and color discrimination would naturally arise from defendant's administrative investigation of plaintiff's claim of national origin discrimination. Defendant's filings do not betray any lack of notice or disadvantage resulting from plaintiff's inartful pleadings at the administrative complaint stage. The Court therefore finds that plaintiff has exhausted his administrative remedies, and that his claims of discrimination based on national origin, race, skin color, and sex may be considered by the Court.

IV. Employment Discrimination

Defendant has moved to dismiss plaintiff's employment discrimination charge, or, in the alternative, for summary judgment. Def.'s Mot. at 1. Both parties have attached numerous evidentiary exhibits supporting and opposing summary judgment to their pleadings. See Def.'s Mot. Exs. A-II; Pl.'s Opp'n Exs.1-24; Def.'s Reply to Pl.'s Opp'n [Docket Entry 9], Ex. A. By attaching those exhibits, "[a]ll parties" have demonstrated that they have been "given a reasonable opportunity to present all the material that is pertinent to the motion." Id.; see Yates v. District of Columbia, 324 F.3d 724, 725 (D.C. Cir. 2003). Therefore, all of the attached exhibits have been considered, and the motion will be treated as one for summary judgment.

In McDonnell Douglas Corp. v. Green, the Supreme Court set forth an elaborate framework for the "order and allocation of proof" in an employment discrimination claim. 411 U.S. 792, 800 (1973). Although the plaintiff bears the initial burden of proof, once the plaintiff establishes a prima facie case of employment discrimination, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. Id. at 802. However, the employer need not "persuade the court that it was actually motivated by the proffered reasons," and only needs to "raise[] a genuine issue of fact as to whether it discriminated against the plaintiff." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254-55 (1981). And when an employer has offered a legitimate, non-discriminatory reason for the adverse employment action, "the district court need not – and should not – decide whether the plaintiff actually made out a prima facie case." Brady v. Ofc. of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir 2008). Instead, when deciding the employer's motion for summary judgment, the central inquiry becomes whether "the employee [has] produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason, and that the

employer intentionally discriminated against the employee on the basis of race, color, religion, sex or national origin." Id.

Defendant has offered a legitimate, non-discriminatory reason for terminating plaintiff: he failed the required field training program, including the remedial training. See Def.'s Mot. at 23, 27, 30. In addition, defendant offers a second legitimate reason for terminating Lin's employment: he engaged in unsuitable conduct by supplying a false address to supervisors, calling in sick to avoid training with Officer Freedman, and being tardy on one occasion. See Def.'s Mot at 19, 31. Since defendant "has done everything that would be required of him if plaintiff had properly made out a prima facie case," the Court need not examine "whether [Lin] really did so." U.S. Postal Serv. Bd. of Governors v. Aikens, 406 U.S. 711, 715 (1983).

Instead, the Court must examine whether Lin has rebutted defendant's asserted non-discriminatory reasons, without "engaging in 'judicial micromanagement of business practices by second-guessing employer's decisions.'" Ndondji v. InterPark, Inc., 768 F. Supp. 2d 263, (D.D.C. 2011) (quoting Baloch, 550 F. 3d at 1191). To rebut the defendant's asserted reasons, Lin must produce evidence that would allow a reasonable jury to find that defendant did not actually terminate him because he failed the required training or because he engaged in unsuitable conduct, but rather that the proffered reasons were a pretext for a decision actually motivated by unlawful discrimination based on Lin's protected status. See Brady, 520 F.3d at 494. The evidence can come in "any combination of (1) evidence establishing plaintiff's prima facie case; (2) evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff, such as independent evidence of discriminatory statements or attitudes on the part of the

employer." Holcomb v. Powell, 433 F. 3d 889, 897 (D.C. Cir. 2006) (citing Aka v. Washington Hosp. Ctr., 156 F. 3d 1284, 1289 (D.C. Cir. 1998) (en banc)).

The evidentiary exhibits attached to the parties' respective motions make clear that although defendant and plaintiff perceive the meaning and significance of the factual circumstances differently, the factual circumstances themselves are largely undisputed – in other words, there is "no genuine issue of material fact" driving their differing views. Anderson, 477 U.S. at 247-48 (emphasis added). This general agreement on the facts is indicated by the overlapping evidence the parties offer in support of their motions. With few exceptions, both parties have attached the same affidavits and reports to support their claims. Compare Def.'s Mot., Ex. C (Freedman Aff.) with Pl's Opp'n, Ex. 5 (same); compare Def.'s Mot., Ex. D (Wkly. Obs. Report, Dec. 2-13, 2008); with Pl.'s Opp'n, Ex. 11 (same); compare Def.'s Mot., Ex. E (Email from Schirmer to Adamchick, Mar. 25, 2009) with Pl.'s Opp'n, Ex. 10 (same); compare Def.'s Mot., Ex. P (Berberich Aff.) with Pl.'s Opp'n, Ex. 6 (same).

Defendant contends that this evidence is consistent with a routine personnel decision based on a recruit's poor performance, while Lin argues that the evidence betrays discriminatory animus. Significantly, however, Lin has not contested the underlying events and performance problems that caused his instructors to evaluate him unfavorably during training, such as his failure to properly control suspects who were exiting their vehicles, see Def.s Mot., Ex. H (Omo's Tri-Wkly Evltn. Form, Jan. 25, 2009-Feb. 1, 2009), his failure to interview one of the motorists involved in a three-car accident, see Def.'s Mot, Ex. N. (Wkly Evltn. Form, Mar. 15, 2009), or the unsafe and illegal search he conducted during remedial training, see Def's Mot., Ex. S (Supervisor's Tri-Wkly Evltn. Form, Mar. 9-28, 2009). Instead, Lin essentially "concedes the infractions," Baloch, 550 F. 3d at 1200, preferring to tabulate and compare the number of

13

"needs improvement" and "satisfactory" marks given to him by various instructors. Pl.'s Opp'n at 11-14. Defendant, however, does not dispute that Officer Freedman gave Lin noticeably lower performance ratings than some of his other instructors. Def.'s Stmt. ¶¶ 5, 7, 22. Instead, defendant focuses on the universal recognition of Lin's deficiencies by his instructors, see, e.g., id. ¶¶ 11, 12, 13, 18, 23, and the tendency of Lin's particular deficiencies to pose safety concerns to himself and others, see, e.g., id. ¶¶ 5, 12, 22, 31, 33. These "conced[ed] . . . infractions form[] the basis" for the most convincing non-discriminatory reason defendant has proffered for terminating plaintiff – his failure of the training program. Baloch, 550 F. 3d at 1200.

This is particularly true because Lin was a probationary employee pursuant to 5 C.F.R. § 315.801, and defendant therefore faced a different decision than it would have for a permanent employee in deciding whether to retain, advance, or terminate him. See Arnett v. Kennedy, 416 U.S. 134 (1974); see also Holbrook, 196 F. 3d at 262. Indeed, the relevant regulation makes the termination of unqualified employees mandatory during the probationary period: "The agency . . . shall terminate [the probationary employee's] services during this period if he fails to demonstrate fully his qualifications for continued employment." 5 C.F.R. § 315.803 (emphasis added); see also McMillan v. Powell, 526 F. Supp. 2d 51, 56-57 (D.D.C. 2007) (emphasizing that the termination of unqualified employees is mandatory). Any recruit who fails to complete the training program has "not demonstrated fully his qualifications for continued employment" and must be terminated under the pertinent regulations. 5 C.F.R. § 315.803; see Def.'s Mot. Ex. W (Schirmer Aff.) at 3; Ex. C (Freedman Aff.) at 3. Hence, unless judging Lin's performance in field training to be inadequate and failing him was a pretext for discrimination based on his national origin, race, color, or sex, Lin's failure was not only a legitimate reason for terminating him, it was a mandatory reason.

Plaintiff has not shown that there is a "genuine dispute" about whether he was failed in the training program as a pretext for unlawful discrimination. Plaintiff's pretext argument has two distinct components: first, that Officer Evans's criticism of his alleged inability to work with women was based on his protected status, and second, that her criticism influenced the supervisors who give Lin the poor evaluations that led to his eventual termination. Pl.'s Opp'n at 10-16. It is conceivable that plaintiff could show a genuine dispute of material fact as to the first part of his argument. On the one hand, plaintiff offers little except his personal opinion to show that Officer Evans's criticisms were based on his protected status; there is no claim that Officer Evans made any reference to Lin's sex, national origin, race, or skin tone, and there is no obvious correlation between his sex, national origin, race or skin tone and a perceived inability to work with women. On the other hand, in one of Lin's three accounts of the incident with Officer Evans, Officer Evans said that "based on who you are, I already know that you don't like working with females." That alleged statement is troubling, and even though it does not explicitly reference any protected characteristics, it might be enough to create a jury issue.

The second piece of Lin's argument, however – that Officer Evans's criticism influenced the decisions of the supervisors who terminated Lin – has no support in the record. Plaintiff has proffered no evidence that many of the officers who gave him negative evaluations, including Officers Omo and Whitehead, even heard Officer Evans's comments. Moreover, defendant has offered abundant evidence that those officers and several others repeatedly documented their detailed, specific criticisms of Lin's performance, none of which had anything to do with Lin's ability to work with women. Only Lin's "own personal opinion" connects Officer Evans's comments with other officers' reports of Lin's inability to handle particular situations, suspects, and aspects of police work. But "the employee's own personal opinion" is insufficient to prove

pretext. Colbert v. Tapella, 649 F. 3d 756, 759 (D.C. Cir. 2011) (internal quotation marks omitted); see also Vatel v. Alliance of Auto. Mfrs., 627 F. 3d 1245, 1247 (D.C. Cir. 2011) (a "[plaintiff's] mere opinion" or "self-assessment" is irrelevant in an employment discrimination claim; the proper inquiry is into "the perception of the decisionmaker").

Plaintiff has chosen not to contest the "abundant and uncontroverted independent evidence" of his poor performance and safety concerns. Therefore, Lin has not created a genuine issue of material fact "as to whether employer's [proffered legitimate non-discriminatory] reason was untrue." Reeves v. Sanderson Plumbing Prods, Inc., 530 U.S. 133, 148 (2000). In addition, defendant has offered a second legitimate, nondiscriminatory reason for terminating plaintiff: his unsuitable conduct. Plaintiff has similarly failed to rebut this proffered reason, which provides further support for defendant's motion for summary judgment. Hence, the evidence submitted by Lin is not enough to convince a reasonable jury that his failure of training was a pretext for unlawful discrimination, and defendant is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Brady, 520 F. 3d at 494. Defendant's motion for summary judgment on plaintiff's Title VII employment discrimination claim will therefore be granted.

## V. Hostile Work Environment

Employers may not create or condone a hostile work environment. Such an environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 78 (1998) (internal quotation marks omitted). However, the "key terms . . . are 'severe,' 'pervasive,' and 'abusive,' as not just any offensive or discriminatory conduct rises to an actionable hostile work environment." Nuriddin v. Bolden, 674 F. Supp. 2d 64, 93 (D.D.C.

2009). In Faragher v. City of Boca Raton, the Supreme Court articulated "demanding" standards for a hostile work environment claim, meant to "filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing," thus ensuring that "Title VII does not become a general civility code." 524 U.S. 775, 787 (1998) (internal quotation marks omitted). Under Faragher, in determining whether an environment is "sufficiently hostile or abusive" to be "both objectively and subjectively offensive" enough to be actionable, the Court looks at "all of the circumstances," including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or merely offensive; and (4) whether the conduct unreasonably interferes with the employee's performance. Id. at 787-88.

Both parties have submitted evidence that the Court has considered in deciding this claim, so the motion is appropriately considered as one for summary judgment. Fed. R. Civ. P. 12(d); see Yates, 324 F.3d at 725. This evidence is largely the same evidence that the parties rely upon in their motions supporting and opposing summary judgment on the employment discrimination claim, and it is similarly evident that the parties agree on the material facts that form the basis for Lin's hostile work environment claim.

Lin bases that claim on Officer Freedman's statements and actions. He claims that Officer Freedman "did not treat him collegially or respectfully" and "immediately engaged him in a negative manner." Pl.'s Opp'n at 15. He also claims that she turned up the radio so he could not hear police communications and engaged in "pranks to aggravate plaintiff," such as driving too fast on a damp highway. Id. In addition, Lin claims that Officer Freedman and another officer took him into a conference room and told him "not to worry about the rumors that

17

Plaintiff had problems with female officers," but would not tell him who was spreading the rumors. Id. at 16.

None of these allegations are denied by defendant, but defendant offers a different interpretation of the events underlying these allegations. For example, while plaintiff discusses Officer Freedman's "immediate engag[ement] of him in a negative manner," id. at 15, Officer Freedman describes a necessary "critiquing" that "[Lin] does not handle" and attributes this to his "disinterested" attitude, id., Ex. 11. Similarly, defendant does not deny that the speeding incident happened, but stands by Officer Freedman's claim that such speeding was something park police officers would "do to one another when there [was] no one else on the road," instead of something "done to aggravate [Lin]." Id., Ex. 5.

These differing interpretations of the same events and actions do not amount to "genuine issue[s] of material fact[s]." Anderson, 477 U.S. at 247-48 (emphasis added). Even when all inferences are drawn in the plaintiff's favor, these factual allegations are more akin to "the ordinary tribulations of the workplace" than discriminatory conduct that is sufficiently "objectively and subjectively offensive" to form the basis of a hostile work environment claim. Faragher, 524 U.S. at 787. While it is clear that Lin "had a rocky working relationship" with Officer Freedman, "neither the frequency nor content of the interactions" that Lin describes "amounts to severe and pervasive treatment sufficient to alter the conditions of [his] employment." Singh v. U.S. House of Representatives, 300 F. Supp. 2d 48, 56 (D.D.C. 2004). "Criticisms of a subordinate's work and expressions of disapproval (even loud expressions of disapproval) are the kinds of normal strains that can occur in any office setting . . . and do not demonstrate a work environment . . . pervaded by discrimination." Id. Particularly given that Officer Freedman's criticisms were closely connected to Lin's work performance, the mere fact

that Lin perceived them as negative or uncollegial does not establish that they objectively met the level of pervasiveness, offensiveness, and seriousness required to make a hostile work environment claim. Id.; see Faragher, 524 U.S. at 787.

In addition to the lack of pervasiveness and severity, Lin has submitted no proof that the actions he complains of were "the result of discrimination based on a protected status." Lester v. Natsios, 290 F. Supp. 2d 11, 22 (D.D.C. 2003). For a Title VII hostile work environment claim to succeed, the objectively offensive conduct must be connected to such discrimination. See Oncale, 523 U.S. at 78. Nothing connects the allegedly abusive statements and conduct of Officer Freedman and other Park Police employees to Lin's Chinese national origin, male sex, or Asian race and skin tone. See Pl.'s Opp'n at 7. Lin does not allege that any discriminatory remarks were made. See id. It is "'important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination,'" lest the federal court "'become a court of personnel appeals.'" Nuriddin v. Goldin, 382 F. Supp. 2d 79, 107 (D.D.C. 2005) (quoting Alfano v. Costello, 294 F. 3d 365, 377 (2d Cir. 2002)). Because the actions about which Lin complains were not sufficiently severe, pervasive, or abusive to affect a term, condition, or privilege of Lin's employment, and because none of the actions had any clear connection to the claimed grounds of discrimination, defendant is entitled to judgment as a matter of law.

## VI. Conclusion

Defendant has offered a legitimate non-discriminatory reason for terminating Lin in response to his employment discrimination claim. Because Lin has failed to offer any evidence that the legitimate non-discriminatory reason was a pretext for unlawful discrimination, defendant is entitled to judgment as a matter of law on that claim. In addition, even viewed in the

light most favorable to Lin, none of the evidence is sufficient for a jury to reasonably find for Lin on the hostile work environment claim. Hence, defendant is entitled to judgment as a matter of law on this claim as well.

The Court will therefore grant defendant's motion for summary judgment on plaintiff's employment discrimination claim. A separate order accompanies this opinion.

/s/

JOHN D. BATES
United States District Judge

Dated: September 18, 2012